In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 23-1800

PIT ROW, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

COSTCO WHOLESALE CORPORATION,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:20-cv-00738 — **William C. Griesbach**, *Judge*.

———————————

ARGUED FEBRUARY 7, 2024 — DECIDED APRIL 30, 2024

———————————

Before WOOD, LEE, and PRYOR, *Circuit Judges*.

WOOD, *Circuit Judge*. The plaintiffs in this appeal, a dozen gas stations in the Green Bay, Wisconsin, area, contend that Costco Wholesale Corporation ("Costco") violated a Wisconsin law that prohibits selling gasoline for less than the statutorily defined cost. They seek an injunction that prevents Costco from selling gasoline below that level and over half a million dollars each in damages. Costco argues that on nearly every date at issue it lowered its prices only to match a

competitor's price, which the statute allows, and that in any event, the plaintiffs failed to establish the causal element of the statutory claim. The district court agreed with Costco and awarded it summary judgment. The plaintiffs challenge that decision, as well as an evidentiary ruling the court made earlier in the proceedings. We affirm on both counts.

## I

### A. The Act

At the center of this appeal lies Wisconsin's Unfair Sales Act, Wis. Stat. § 100.30 ("the Act"), commonly known as the "Minimum Markup Law." Like many similar laws that were enacted by state legislatures after the first World War, the Act purports to mandate trade-regulation concepts similar to those that motivated the National Industrial Recovery Act of 1933, Pub. L. No. 73-67, 48 Stat. 195, *invalidated by A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935). See, *e.g.*, IOWA CODE ANN. § 551.1–555.2, 551.4–551.11; MINN. STAT. ANN. § 325D.03; see also Robinson-Patman Act of 1936, Pub. L. No. 74-692, 49 Stat. 1526 (codified at 15 U.S.C. § 13). Wisconsin's Act has been modified several times over its eighty-some-year life, but the policy underlying the legislation has remained the same. The first provision of the Act states its rationale: "The practice of selling certain items of merchandise below cost in order to attract patronage is generally a form of deceptive advertising and an unfair method of competition in commerce." Wis. Stat. § 100.30(1).

Motor-vehicle fuel (that is, gasoline) is one of the items of merchandise covered by the Act. As relevant here, the law makes loss leaders unlawful by prohibiting "[a]ny sale of any item of merchandise … by a retailer … of motor vehicle

fuel … , at less than cost as defined [by the Act] with the intent or effect of inducing the purchase of other merchandise or of unfairly diverting trade from a competitor[.]" *Id.* § 100.30(3). Formulas set forth in the statute determine the minimum lawful selling price in relation to the costs borne by the retailer. See *id.* § 100.30(2)(am). The statutory definition of the cost of motor-vehicle fuel is the greater of either invoice or replacement cost plus a markup of 6%, or the average posted terminal price plus a markup of 9.18%. See *id.* § 100.30(2)(am)(1m)(a). We refer to this as the "minimum markup price."

The minimum markup requirement for motor-vehicle fuel can be enforced by district attorneys, the Wisconsin Department of Agriculture, Trade and Consumer Protection ("the Department"), and private parties. The Act specifically affords a private right of action for "[a]ny person who is injured or threatened with injury as a result of a sale or purchase of motor vehicle fuel" in violation of the Act. *Id.* § 100.30(5m). (A separate Wisconsin statute provides that the word "person" under state statutory law "includes all partnerships, associations and bodies politic or corporate." Wis. Stat. § 990.01(26); see also *Village Food & Liquor Mart v. H & S Petroleum, Inc.*, 647 N.W.2d 177, 183 n.7 (Wis. 2002) (applying that statutory definition of "person" to the Act).) Private individuals may seek either injunctive relief or the greater of treble damages or $2,000, multiplied by each day of continued violation of the Act. See Wis. Stat. § 100.30(5m). The Act also provides that "[e]vidence of any sale of any item of merchandise by any retailer … of motor vehicle fuel … at less than [the minimum markup price] shall be prima facie evidence of intent or effect to … injure a competitor." *Id.* § 100.30(3).

The Act lists nine exceptions to liability. See *id.* § 100.30(6); § 100.30(7)(c)(2). Relevant here is the seventh exception, see *id.* § 100.30(7), which the Wisconsin courts have referred to as the "'meeting competition' exception," see, *e.g.*, *Go America L.L.C. v. Kwik Trip, Inc.*, 715 N.W.2d 746, 749 (Wis. Ct. App. 2006). *Cf.* 15 U.S.C. § 13(a) (Robinson-Patman's "meeting competition" defense). This exception states that the Act "shall not apply to sales at retail … where … [t]he price of merchandise is made in good faith to meet an existing price of a competitor and is based on evidence in the possession of the retailer … in the form of … [a] business record maintained by the retailer … in the ordinary course of trade or the usual conduct of business." *Id.* § 100.30(6)(a)(7). An "existing price of a competitor" is "a price being simultaneously offered to a buyer for merchandise of like quality and quantity by a person who is a direct competitor of the retailer … and from whom the buyer can practicably purchase the merchandise." *Id.* § 100.30(2)(cj). A retailer that lowers the price of motor-vehicle fuel in good faith must "submit to the [D]epartment notification of the lower price before the close of business on the day on which the price was lowered[.]" *Id.* § 100.30(7)(a). "Failure to comply" with the notification requirement "creates a rebuttable presumption that the retailer … of motor vehicle fuel … did not lower the price to meet the existing price of a competitor." *Id.* § 100.30(7)(b).

## B. The Parties

The plaintiffs are twelve corporations that each own and operate a retail gas station in Green Bay, Wisconsin. (We refer to them collectively as "the Green Bay Stations" unless context requires otherwise.) They are open to all customers, unlike defendant Costco. Anyone can buy gasoline from them,

and no one must purchase other products or services from the convenience stores attached to the stations as a condition of obtaining their gasoline.

Costco owns and operates members-only warehouses across the country. Each warehouse offers a "destination" shopping experience with a wide array of products and services, including (at many locations) motor-vehicle fuel. Costco's business model is predicated on bringing high-quality products to its members at the lowest possible prices. Anyone can become a member and thus take advantage of what Costco offers, for a small fee; when a person becomes a member, they must provide certain information, including an address-of-record. In October 2013, Costco opened a warehouse that offers motor-vehicle fuel at 2355 Costco Way, Bellevue, Wisconsin ("Bellevue Costco"), a village near the Green Bay metropolitan area with about 14,500 residents.

Costco uses a commercial gasoline-price reporting system called PricePro to monitor the daily gasoline prices of 42 gas stations that it considers to be direct competitors in the Green Bay area. If a gas station is located within a five-mile radius of the Bellevue Costco, then Costco automatically considers it a direct competitor. In addition, it relies on employees and customers of the Bellevue Costco to identify gas stations outside that geographic area that might be direct competitors. When a station is identified as a possible competitor, Costco's Gas Department turns to its "heat map" of the addresses-of-record of Costco members who already have purchased gasoline at the Bellevue Costco to determine whether a critical number of them live near the potentially competing station or are likely to pass by it on their way to the warehouse. If a sufficient

number of gasoline-purchasing members live near the station, Costco will deem it a direct competitor.

The Bellevue Costco matches the gasoline prices offered by gas stations that it considers to be direct competitors. Its employees physically verify the two or three lowest prices offered each day; they also seek visual confirmation when a suspiciously low price is reported. (Costco largely suspended its daily in-person verification procedures in early 2020 to comply with stay-at-home requirements in place during the COVID-19 pandemic, but otherwise has consistently abided by the practice.) If Costco intends to match the price of gasoline offered by a particular direct competitor, its Gas Department records the reduced price in spreadsheets that collectively are known as the "Comp Shop Log."

Three of the gas stations that the Bellevue Costco identified as direct competitors are relevant to this lawsuit. The first is a BP gas station located at 601 Lawe Street in Kaukauna, Wisconsin ("the Kaukauna BP"), which is about 24 miles (and a 24-minute drive) from the Bellevue Costco. Costco's records indicate that upwards of 500 of its members with an address-of-record in Kaukauna made at least one purchase inside the Bellevue Costco warehouse between October 2019 and the end of 2020, and that 236 members with such an address-of-record collectively purchased gas 1,644 times at that warehouse during that period. Although the Green Bay Stations dispute whether all of the hundreds of members Costco identified actually live within the municipal boundaries of Kaukauna, they concede that 236 members with an address-of-record in Kaukauna purchased gasoline from the Bellevue Costco between those dates.

Costco also matches the prices of two Marathon Stations located in the Green Bay area ("the Marathon Stations"). Although the Marathon Stations advertise only their "street" or "sticker" price, they allow any customer to sign up for a rewards program known as *MakeItCount Rewards*. A customer who joins *MakeItCount Rewards* needs only to swipe her membership card at the pump to save five cents per gallon of gasoline purchased. So, for example, if the sticker price offered by the Marathon Stations is $2.50 per gallon, a rewards member will pay just $2.45 per gallon. The Bellevue Costco matches the discounted price.

## C. This Lawsuit

The Green Bay Stations filed this lawsuit against Costco in Wisconsin state court on March 30, 2020. Their third amended complaint contends that Costco violated the Act on 256 days between October 1, 2019, and December 31, 2020, by selling regular unleaded motor-vehicle fuel at the Bellevue Costco below the minimum markup price. (The Green Bay Stations initially alleged violations on 263 days, but they later withdrew their allegations against Costco for seven of those days—March 3, 5, and 7–12, 2020.) They assert that Costco's gasoline-pricing practices threatened them with lower profit margins and a reduction in customer volume, and that it actually injured them in those ways. The Green Bay Stations seek $2,000 each per day of violation plus interest, attorneys' fees, and a permanent injunction to prevent Costco from selling gasoline below the minimum markup price. They also sought (unsuccessfully) to certify a class under Wisconsin law consisting of all retailers of regular unleaded motor-vehicle fuel who were competitors of the Bellevue Costco and who

sold the fuel at or above Costco's price during the 458-day pe-riod set forth in the complaint.

Costco timely removed the case to the Eastern District of Wisconsin, invoking the court's diversity jurisdiction. See 28 U.S.C. § 1441(b); 28 U.S.C. § 1332(d). It then moved for an or-der compelling the Green Bay Stations to disclose all gasoline-pricing data from October 1, 2017, to March 30, 2018, and all gasoline sales-volume data for the period from October 1, 2017, to March 30, 2019. See FED. R. CIV. P. 37. Costco argued that this data was necessary to prove whether the Green Bay Stations suffered an actual injury or were threatened with in-jury within the meaning of the Act. The Green Bay Stations opposed the motion.

In an order dated December 4, 2020, the district court granted Costco's motion to compel, explaining that the data might be relevant to the question of constitutional standing. Later, an exhibit entitled "Party Fuel Sale Trend Charts" was produced; it contained data about daily gallons of gasoline sold from October 1, 2017, through December 2020. Over that time, each of the Green Bay Stations saw a downward trend in gallons of gasoline sold per day. In separate submissions, each plaintiff testified through a corporate representative that its profits had declined during the period 2017 through 2020. All of the representatives also stated that they had received questions from customers about why their prices for gasoline were higher than Costco's.

Discovery continued into November 2021, when the Green Bay Stations disclosed the expert report of a former gasoline industry executive, Donald Strenk. He testified that in his experience, a Costco entering a motor-vehicle-fuel mar-ket poses a significant competitive threat to existing retailers

in that market. Based on his professional experience and familiarity with price-elasticity modeling, Strenk said that he was able to conclude to "a reasonable degree of certainty" that the Green Bay Stations were at a minimum threatened by the Bellevue Costco's pricing practices.

The Green Bay Stations also disclosed an expert report from Paul Dingee, who served as the Chief of the Department from July 1993 until January 2014. Dingee testified that when a Costco warehouse enters a market for motor-vehicle fuel, each existing retailer must make one of two pricing decisions: it can either lower its prices to meet Costco's, or it can maintain them and risk losing customers. And so, according to Dingee, a retailer competing with a Costco would be presented with a Hobson's choice: whichever route it chose, it would suffer lost profits.

Costco then disclosed expert reports from Alan Sorenson and John Nevin, who are professors of economics and marketing, respectively. Sorenson testified that he found no statistically significant correlation between the Bellevue Costco's pricing practices and the Green Bay Stations' declining sales. The Green Bay Stations responded with a "rebuttal" report from Strenk, who claimed that a U.K.-based firm called Kalibrate had generated a "sophisticated simulation model" that showed Sorenson's conclusion was "categorically false." When the Green Bay Stations refused to disclose the data underlying the Kalibrate analysis, Costco moved to preclude it. The district court granted the motion, ruling that the Green Bay Stations could rely on neither the Kalibrate analysis nor Strenk's summary of it.

Costco deposed Strenk on January 20, 2022. During the deposition, Strenk informed Costco that after the Kalibrate

analysis had been precluded he had conducted his own statistical analysis of the Green Bay Stations' pricing and sales data, and that he had shared the new analysis with the Green Bay Stations a day ago. Three weeks later, the Green Bay Stations filed a motion to supplement their expert report with Strenk's new analysis. Costco opposed the motion, arguing that the proposed supplement would undermine its discovery efforts in the midst of briefing on class certification and summary judgment.

The district court held a hearing on the motion on April 18, 2022. After hearing arguments from both sides, the court observed that the time for disclosure had long passed, and that Costco had conducted discovery in reliance upon the expert reports the Green Bay Stations already had disclosed. Allowing the Green Bay Stations to supplement their expert reports at the eleventh hour would force Costco either to redo or to change the course of discovery and would thus prejudice its defense. For these reasons, the court denied the Green Bay Stations' motion to supplement.

On March 1, 2022, Costco moved for summary judgment and for the denial of class certification. The district court granted summary judgment to Costco and denied the Green Bay Stations' request to certify a class. (Its ruling on the class aspects of the case is not before us on appeal, and so we do not discuss it.) On the merits, the court concluded that for 238 days at issue, Costco was immune from liability pursuant to the meeting-competition exception set forth in the Act. For the

remaining 18 days,[1] the district court found a genuine dispute of fact about whether Costco sold gasoline below the minimum markup, and thus determined that for those days Costco could not assert immunity under the exception. Nonetheless, it further concluded that for all 256 days, Costco was entitled to summary judgment because the Green Bay Stations had failed to show that they were injured or threatened with injury within the meaning of the Act. The Green Bay Stations now appeal the adverse award of summary judgment and the earlier denial of their request to supplement their expert report.

## II

Before we may address the merits of this appeal, we have "an obligation to assure ourselves" that the litigants have Article III standing. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006) (quotation omitted). To maintain an action in federal court, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). At the summary judgment stage, the plaintiff "must 'set forth' by affidavit or other evidence 'specific facts'" to support each element, "which for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561 (quoting FED. R. CIV. P. 56(e)).

---

[1] Those 18 days are February 29, 2020; March 1–2, 4, and 6, 2020; April 14–15, 2020; June 26–30, 2020; September 2–3, 2020; and October 9, 11, 14, and 17, 2020.

Little need be said about redressability. The Green Bay
Stations seek statutory damages and injunctive relief, both of
which are remedies that would "'affect the behavior of the de-
fendant towards the plaintiff,' and thus independently pro-
vide redress." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801
(2021) (quoting *Hewitt v. Helms*, 482 U.S. 755, 761 (1987) (alter-
ation omitted)). We thus focus our attention on the first two
elements.

## A. Injury in Fact

The Green Bay Stations do not need to show that they have
a meritorious claim to satisfy the injury-in-fact requirement.
See *Owsley v. Gorbett*, 960 F.3d 969, 971 (7th Cir. 2020). But they
must "show that [they] suffered an invasion of a legally pro-
tected interest that is concrete and particularized and actual
or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S.
at 339 (cleaned up). In plain English, a litigant is not required
to show that it will win in order to establish standing. All it
must do to satisfy Article III is show that it "ha[s] a colorable
*claim* to such a right." *Aurora Loan Servs. Inc. v. Craddieth*, 442
F.3d 1018, 1024 (7th Cir. 2006). "Were we to require more than
a colorable claim, we would decide the merits of the case be-
fore satisfying ourselves of standing." *Booker-El v. Superinten-
dent, Indiana State Prison*, 668 F.3d 896, 900 (7th Cir. 2012).

We accept that the injury the Green Bay Stations alleged is
judicially cognizable. They claim that they suffered lost prof-
its and a decline in customer volume, and that they have a
legally protected interest in maintaining both their profits and
their customers. As the Supreme Court recently reminded us,
"monetary harms" are among the "most obvious" kinds of in-
jury in fact. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425
(2021); *cf. Lexmark Intern., Inc. v. Static Control Components, Inc.*,

572 U.S. 118, 126 (2014) (indicating that "lost sales and damages to … business reputation" are injuries in fact).

They also have proffered sufficient evidence of their alleged harms. Each of the Green Bay Stations introduced testimony from a representative who claimed that their business saw a decline in profits, as well as data showing a reduction in their gasoline sales by volume, during the period stated in the complaint. Given the nature of the claims that the Act authorizes (*i.e.*, actions for threatened or actual injury), that evidence, taken as true, is enough to establish that the Green Bay Stations have a colorable claim at the summary judgment stage. See *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("Standing … often turns on the nature and source of the claim asserted."); *cf. Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722, 736 (7th Cir. 2020) (noting that "when the existence of a protected property interest is an element of the claim, deciding whether the interest exists virtually always goes to the merits rather than standing").

## B. Traceability

A similar principle informs our traceability inquiry. This element of standing "examines the causal connection between the assertedly unlawful conduct and the alleged injury." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984). Significantly, "[p]roximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct." *Lexmark*, 572 U.S. at 134 n.6. An injury is not fairly traceable to a defendant's conduct if the causal chain is "attenuated," *Allen*, 468 U.S. at 757, but Article III requires no more than a "meaningful[] connect[ion]" between the two, *Dep't of Ed. v. Brown*, 600 U.S. 551, 568 (2023). Put simply, a plaintiff must show "a substantial likelihood"

of causation. *Duke Power Co. v. Envt'l Study Grp., Inc.*, 438 U.S. 59, 75 n.20 (1978).

The record includes both lay and expert testimony stating that Costco's pricing practices at least threatened the Green Bay Stations with the financial injuries they described. For example, the Green Bay Stations retained an expert witness, Dingee, who explained that, because of Costco's business model, when a Costco warehouse enters a market for motor-vehicle fuel, the inevitable result for a retailer already in that market will be diminishing returns: it will be forced either to lower its prices (and thus lose profits) or to maintain its prices (and thus lose customers and, in turn, profits). Strenk testified, specific to the parties to this case, that he was reasonably certain that the Bellevue Costco's pricing practices would, at a minimum, pose a threat of lost profits to the Green Bay Stations. And representatives for each of the Green Bay Stations testified that they believed Costco's practices caused the financial injuries the stations claim to have experienced.

This evidence is enough to establish, for purposes of Article III standing, a meaningful connection between Costco's pricing practices and the Green Bay Stations' threat of injury. *Cf. Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, 925–26 (7th Cir. 1995) (concluding that soybean farmers who were forced to sell their product at a lower price had standing to sue the Chicago Board of Trade where the allegations, taken as true for purposes of a motion to dismiss, showed that a conspiracy between the Board and several individuals "played some role in setting the cash price for soybeans"). A plaintiff who asserts that he suffered from lost profits can establish the traceability element of causation at the summary judgment stage by "present[ing] some evidence that he has

lost money because [the defendant] forced him to set prices artificially low" and that the customers "who purchased his products would have paid more." *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1297 (7th Cir. 1993), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). The Green Bay Stations' testimony does exactly that.

We readily acknowledge that the line between "specific" and "conclusory" allegations is a fine one. But the testimony submitted by the Green Bay Stations was precise enough to allow Costco to identify the particular conduct that allegedly harmed the stations. In that connection, we emphasize that the question at this point of the analysis is not whether the testimony *proves* that Costco's pricing practices caused harm to the Green Bay Stations, but only whether it is sufficient to show a substantial likelihood of causation. To require anything more than what the Green Bay Stations have submitted would conflate the standing inquiry with a determination on the merits. The evidence presented here is enough to establish the traceability element for purposes of Article III standing, and so we may proceed.

## III

Before reaching the merits, we have a second preliminary issue to resolve. The Green Bay Stations challenge the district court's order denying their motion to supplement Strenk's expert report with his new analysis after the court refused to admit the Kalibrate analysis. We review the district court's ruling for abuse of discretion. See *Vance v. Ball State University*, 646 F.3d 461, 469 (7th Cir. 2011).

The Green Bay Stations moved to supplement Strenk's expert report on February 11, 2022. By that time, discovery had

been open for over two years, and nearly six months before the motion Costco had disclosed its own expert report, which included a cross-price elasticity analysis. Dispositive motions on class certification and summary judgment were due in less than three weeks, and yet, despite the looming deadlines, the Green Bay Stations still allowed three weeks to pass after Strenk informed Costco of his new analysis to file their motion to supplement. On these facts, the district court was entitled to conclude that allowing the supplement would be prejudicial to Costco's efforts to prepare its defense. "We regularly affirm a district court's decision to exclude supplemental evidence in the interest of keeping cases moving forward," *id.* at 469 (citing *Pfeil v. Rogers*, 757 F.2d 850, 858 (7th Cir. 1985)), and we do so again here.

**IV**

We arrive, finally, at the merits of the appeal. As we explained at the outset, the Green Bay Stations claim that Costco threatened them with, and actually caused them, financial injury by engaging in motor-vehicle-fuel pricing practices that violated the Act on 256 days. The district court found that for 238 of those days, Costco was entitled to immunity from the Green Bay Stations' claim pursuant to the meeting-competition exception to the Act. See Wis. Stat. § 100.30(6)(a)(7). For the remaining 18 days, the court concluded that the Green Bay Stations had failed to establish that Costco's conduct caused them to suffer an injury or threat of injury within the meaning of the Act. The Green Bay Stations challenge each of those conclusions. We evaluate the district court's grant of summary judgment *de novo*, construing the record in the light most favorable to the Green Bay Stations and drawing all

reasonable inferences in their favor. See *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015).

### A. The Meeting-Competition Exception

The Green Bay Stations argue that the district court erroneously concluded that the meeting-competition exception to the Act immunizes Costco from liability on nearly all of the alleged dates of violation. Costco qualifies for this exception only if it was: (1) matching prices simultaneously offered by a direct competitor, (2) compliant with the Act's notification requirement, and (3) price-matching in good faith. See *22 Shawano, LLC v. Dr. R.C. Samanta Roy Inst. of Sci. and Tech., Inc.*, 709 N.W.2d 98, 101–02 (Wis. Ct. App. 2005) (noting that a retailer who complies with the exception "is immune from liability in a private action"). We address these elements sequentially.

### 1. Existing Price of a Direct Competitor

The meeting-competition exception does not apply unless a retailer lowered its prices (or maintained already lowered prices) to match the "existing price of a competitor," Wis. Stat. § 100.30(6)(a)(7), which the Act in turn defines as "a price being simultaneously offered to a buyer for merchandise of like quality and quantity by a person who is a direct competitor of the retailer … of motor vehicle fuel … and from whom the buyer can practicably purchase the merchandise," *id.* § 100.30(2)(cj). Costco argues that it met the prices offered by the Kaukauna BP and matched the five-cent discounted price offered to customers of the Marathon Stations through *MakeItCount Rewards*. It submitted evidence showing that it lowered its prices to match those of the Kaukauna BP on 22 days and those of the Marathon Stations on 89 days, and that

for all but 18 of the days that its gasoline was priced below the minimum markup price from October 1, 2019, to December 31, 2020, it was so priced in order to match one or the other of these competitors.

For their part, the Green Bay Stations do not contest that Costco matched the prices of the Kaukauna BP and the Marathon Stations. They instead argue that Costco was not entitled to match their prices for purposes of the exception.

### i. Kaukauna BP

The Kaukauna BP is not a direct competitor of the Bellevue Costco, the Green Bay Stations contend, because it is in a different and more distant geographic area than every other gas station that Costco identifies as a direct competitor on its "heat map." They stress that the Kaukauna BP is not in the city of Green Bay, that the land between Green Bay and Kaukauna is only lightly developed, and that the Kaukauna BP is roughly 24 miles from the Bellevue Costco. Moreover, they say, although a separate Costco warehouse in Appleton, Wisconsin, is closer to the Kaukauna BP than the Bellevue Costco by nearly seven miles, the Appleton Costco does not consider the Kaukauna BP to be its direct competitor. Costco responds that the Kaukauna BP is a direct competitor because the Bellevue Costco is competing for buyers who could (and do) purchase gasoline from either retailer.

A decision from a Wisconsin intermediate court sheds some light on the meaning of "direct competitor" for this purpose. See *Go America*, 715 N.W.2d at 751. Without distinguishing between "direct competitor" and "competitor," the court concluded that the phrase refers to "one selling or buying goods or services in the same market as another." *Id.* at 806

(quotation omitted). *Go America* thus indicates that, to resolve whether the Kaukauna BP is the Bellevue Costco's direct competitor, we must define the relevant market. If Costco is selling gasoline in the same market as the Kaukauna BP, then the two retailers are direct competitors.

We know from long experience with antitrust cases that an elaborate definition of the relevant market is neither necessary nor, in some cases, possible. See *Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. 447, 460–61 (1986) (concluding that "the finding of actual, sustained adverse effects on competition [in the areas where the dentists] predominated, viewed in light of the reality that markets for dental services tend to be relatively localized, is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis"). It often is enough to approximate the outer boundaries of a product or geographic market.

For guidance on how to approximate the relevant market, we consult the federal Merger Guidelines. The Guidelines state: "A relevant antitrust market is an area of effective competition, comprising both product (or service) and geographic elements. The outer boundaries of a relevant product market are determined by the 'reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, MERGER GUIDELINES 40 (2023) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). Because "'fuzziness would seem inherent in any attempt to delineate the relevant market,'" the Guidelines recommend identifying certain kinds of evidence that may help "to identify a relevant antitrust market." *Id.* (quoting *United States v. Philadelphia*

*Nat'l Bank*, 374 U.S. 321, 360 n.37 (1963) (ellipsis omitted)). Helpful evidence includes "[d]irect evidence of substantial competition between" retailers and "practical indicia," "such as … the product's peculiar characteristics and uses, … distinct customers, … and specialized vendors." *Id.* at 40–41.

The Merger Guidelines show that the Green Bay Stations place far too much weight on geography in their attempt to define the relevant market. The fact that the Kaukauna BP is 24 miles from the Bellevue Costco, and significantly further from the warehouse than any of the other retailers that Costco considers direct competitors, is not dispositive of whether the two are direct competitors. Gasoline is a product for which consumers can (and will) travel some distance. More broadly, the point is that we must attend not only to geography, but also to the specific characteristics of the product being offered and the customers to whom it is being offered, among other practical considerations.

Following that approach, it is evident that Costco shares a market with the Kaukauna BP. As we have noted several times, the parties agree that 236 Costco members with an address-of-record in Kaukauna have purchased gasoline at the Bellevue Costco during the applicable 458-day period. These customers are distinct, insofar as they are members of Costco. But to point out that fact is merely to highlight that Costco has a unique membership structure: unlike the typical customer of the Kaukauna BP, a person who is a member of Costco can take advantage of any of its services, including its gasoline pumps. And, as the testimonies of numerous Costco members show, it is not uncommon to purchase gasoline at Costco while visiting the warehouse to purchase other products. Costco thus has an interest in encouraging its members who

reside in Kaukauna to purchase gasoline at the Bellevue warehouse—*i.e.*, to compete with the Kaukauna BP for customers.

We add that it is far from impracticable for a Costco member with an address-of-record in Kaukauna to purchase gasoline at the Bellevue Costco, rather than at the Kaukauna BP. A person easily could drive 24 miles on very little gasoline; they might already have planned to visit the warehouse for some other product or service and simply added gasoline to the list. Alternatively, they might be in the area for some other reason and choose to take advantage of their Costco membership by filling up their tank.

In sum, we conclude that, owing to its membership structure, Costco's direct competitors should be determined not simply based on the location of the stations, but also on the addresses-of-record of its members. Although there might be some number of customers that is too few to establish the necessary competition, we need not decide here where the lower threshold lies. We are confident that the existence of 200-plus buyers who could practicably purchase gasoline from either the Kaukauna BP or Costco places those two retailers in the same motor-vehicle-fuel market and thus makes them direct competitors for purposes of the Act.

### ii. Marathon Stations

Costco did not lower its prices to match only the Kaukauna BP's prices; on some days, it lowered or matched the prices offered by the Marathon Stations. The Green Bay Stations argue that the Marathon Stations are not direct competitors of Costco, but for a different reason than they believed the Kaukauna BP is not. They do not dispute that the Marathon Stations are in the same market as Costco or that

buyers could practically purchase gasoline from any of those three retailers. Rather, seizing onto the statutory language stating that an "[e]xisting price of a competitor" is a "price being simultaneously *offered to a buyer*," Wis. Stat. § 100.30(2)(cj) (emphasis added), they argue that the Marathon Stations advertised only the sticker price to buyers, not the five-cent reduced price available through *MakeItCount Rewards*, and thus did not "offer" the discounted price to its customers.

As the district court noted, the text of the Act does not restrict a retailer to matching the posted price of its competitors. The terms are broad enough to allow for the matching of any price offered to a buyer, whether that price is advertised or not. Costco was therefore entitled to match the prices offered through *MakeItCount Rewards*, notwithstanding the fact that the Marathon Stations did not advertise them.

The Green Bay Stations insist that this interpretation of the Act is incorrect. As support, they point to two sources: a decision from a Wisconsin state trial court and a regulation promulgated by the Department that interprets the meeting-competition exception. The former does not help their position, as our role as a federal court sitting in diversity is to ascertain how the state appellate courts would interpret the Act. See *West v. American Tel. & Tel. Co.*, 311 U.S. 223, 237–38 (1940). The Wisconsin appellate courts consistently have stated that courts "should not read into the statute language that the legislature did not put in." *Brauneis v. State, Labor and Industry Review Comm'n*, 612 N.W.2d 635, 644 (Wis. 2000) (citing *In re G. & L.P.*, 349 N.W.2d 743 (Wis. 1984)). We cannot, consistent with this principle of construction, interpret "offered to the buyer" as "advertised to the buyer" or "offered to the buyer

in the form of an advertisement," as the Green Bay Stations would have us do.

The Department's regulation provides that "[a] price for merchandise meets an existing price of a competitor under [the Act] only if the merchandise in question is sold on a day when the competitor's price is in effect and is offered under the same terms and conditions as the competitor's offer." Wis. Admin. Code § ATCP 105.009. The Green Bay Stations argue that Costco offered different "terms and conditions" to buyers than the Marathon Stations.

The state agency's interpretation of the Act is less helpful than the Green Bay Stations think. Wisconsin courts no longer defer to administrative agencies' conclusions of law, but they do "give 'due weight' to the experience, technical competence, and specialized knowledge of an administrative agency." *Tetra Tech EC, Inc. v. Wisconsin Dep't of Revenue*, 914 N.W.2d 21, 63 (Wis. 2018). That said, we need not decide how much weight to give to the Department's regulation. Even assuming that its interpretation of the Act is correct, the Green Bay Stations would not prevail because Costco did offer the same terms and conditions as the Marathon Stations. Anyone can become a member of either Costco or the *MakeItCount Rewards* program (or both), and neither Costco nor the program placed gallon restrictions on their prices. The sole difference between the programs—that Costco members must pay a small membership fee—is immaterial because Costco does not compete for motor-vehicle-fuel buyers who are not already members. Thus, to the extent that the regulation sheds light on the meaning of the Act, it does not undermine our conclusion.

The Act places no limitation on what prices a retailer may match; it says only that they must be offered to a buyer. The Marathon Stations are in the same market as Costco and they offered the *MakeItCount Rewards* prices to all customers. Costco was therefore permitted to match the prices of those retailers. Accordingly, for 238 of the days at issue, Costco was matching the prices offered by its direct competitors.

### 2. The Notification Requirement

A retailer cannot claim immunity simply by showing that it lowered its prices to match those offered by a direct competitor; it must also satisfy the Act's notification requirement. The Act states that "[i]f a retailer … of motor vehicle fuel … lowers in good faith the price of motor vehicle fuel below [the minimum markup price] under [the meeting-competition exception], the person shall submit to the [D]epartment notification of the lower price before the close of business on the day on which the price was lowered[.]" Wis. Stat. § 100.30(7)(a). A retailer's failure to comply with this requirement does not prevent it from asserting a defense under the Act. It merely "creates a rebuttable presumption" that the retailer did not lower its prices to meet the existing price of a competitor. *Id.* § 100.30(a)(b).

The district court concluded that, although Costco inadvertently submitted notifications to the Department listing the incorrect competitor on fifty days in which it lowered its prices to match a competitor, Costco overcame the presumption that it did not lower its price for a permissible purpose by introducing business records confirming its compliance with the requirements of the exception. On appeal, the Green Bay Stations do not challenge the court's conclusion. Wisely so: the Act allows a retailer to introduce business records

maintained in the usual course of business to prove that it matched the prices of a direct competitor. See *id.* § 100.30(6)(a)(7). Costco introduced spreadsheets that it calls its "Comp Shop Log," which it updated daily during the relevant period whenever it matched the price offered by a competitor. That document was maintained in its usual course of business, and so it falls within the "other business record" catchall listed in the notification-requirement provision of the Act. This suffices to rebut the presumption that Costco's occasional, unintentional non-compliance with the notification requirement removes it from the safe harbor of the meeting-competition exception.

### 3. Good Faith

The final element of the statutory exception requires an inquiry into Costco's motive or intent. The Act states that a retailer's decision to lower prices to match those of a competitor must be "made in good faith[.]" Wis. Stat. § 100.30(6)(a)(7). Although the Wisconsin courts have been "reluctant to resolve" where the burden of proving good (or bad) faith falls, see *Go America*, 715 N.W.2d at 754–55, the case law offers some clues. In *Go America*, the Wisconsin Court of Appeals assumed for purposes of argument that the defendant affirmatively had to demonstrate its good faith. The defendant introduced testimony that it surveyed its competitors' gasoline prices daily in order to match them, and it submitted copies of its price surveys to support that testimony. The plaintiff, by contrast, failed to introduce anything to "show or create a reasonable inference to the contrary." *Id.* at 756. On that record, the court concluded that the defendant had price-matched in good faith.

The evidence tending to show Costco's motive is substantially identical to the evidence presented by the defendant in *Go America*. Costco has introduced evidence that it monitored its competitors on a daily basis, made efforts to comply with the notification requirement, and kept business records to show its diligence even when it did not notify the Department of its price-matching. The Green Bay Stations, on the other hand, can point only to complaints against Costco submitted to the Department. But unsubstantiated complaints do not reasonably give rise to an inference of bad faith, and so even assuming Costco must establish its good faith, it has done so.

B. The Elements of the Act's Private Right of Action

The Green Bay Stations next argue that the district court erroneously concluded that they failed to establish that Costco's pricing practices caused them to suffer an injury or threat of injury. Because Costco has shown that it is entitled to immunity under the meeting-competition exception for 238 of the days at issue, we need decide only whether Costco injured or threatened the Green Bay Stations with injury on the remaining 18 days. See *supra* n.1. The burden is on the Green Bay Stations to establish each element of their claim. See *Heiden v. Ray's Inc.*, 150 N.W.2d 467, 470–71 (Wis. 1967).

Like the district court, we begin with the statutory element of causation. To determine whether the Green Bay Stations have carried their burden of proving causation, we must first determine what it means for a person to be "injured or threatened with injury *as a result of* a sale or purchase of motor vehicle fuel" below the minimum markup price. Wis. Stat. § 100.30(5m) (emphasis added). Although the Wisconsin courts have not considered what theory of causation is incorporated into the Act by that phrase, they long have held that

a person's conduct causes a particular result when it is a substantial factor in producing that result. See, *e.g.*, *Lang v. Baumann*, 251 N.W. 461 (Wis. 1933); *Fischer by Fischer v. Ganju*, 485 N.W.2d 10 (Wis. 1992). The Act, which was adopted shortly after *Baumann*, thus requires the Green Bay Stations to show that Costco's pricing practices were a substantial factor in causing their lost profits.

In their effort to make that showing, all but one of the Green Bay Stations exclusively rely on the expert reports prepared by Strenk and Dingee. As we explained earlier, Strenk testified, without data, that he could conclude "to a reasonable degree of certainty" that the Bellevue Costco at least threatened the Green Bay Stations' sales volume. Both of the experts testified that a Costco entering a market *would* threaten existing retailers with injury. One plaintiff, Tikapur Petroleum, LLC, also submitted a declaration of a corporate representative who stated that his "general observation" was that his profits and sales were declining and that he "believed this was attributable to Costco's low gas pricing."

The evidence the Green Bay Stations offer is not sufficient to prove causation for purposes of the Act. In the absence of any rigorous market or economic analysis (or even evidence that at least one customer actually elected to purchase gasoline from Costco rather than from the Green Bay Stations because Costco offered lower prices), the testimony upon which the Green Bay Stations rely amounts to little more than "sheer speculation," which the Wisconsin Supreme Court has held is insufficient to establish an element of the Act's private cause of action. *Heiden*, 150 N.W.2d at 638–39. Indeed, in *Heiden*, the court went so far as to say that a proven fact of a single incident of a lost sale is not "sufficient to establish a prima facie

loss or threat of injury." *Id.* at 638. The Green Bay Stations have not introduced evidence that Costco's pricing practices caused even one lost sale. They thus have failed to establish causation, which is an essential element of their claim. This means that Costco is entitled to summary judgment on the remaining 18 days stated in the complaint.

## V

The Act exists to prevent "unfair method[s] of competition in commerce," not to interfere with retailers "who maintain a fair price policy." Wis. Stat. § 100.30(1). When a retailer of motor-vehicle fuel complies with the requirements the statute imposes on its ability to match the prices of a direct competitor, it is engaged in lawful competition. And even when it does not, a plaintiff cannot obtain judicial relief unless it can establish the essential elements of the private right of action. The Green Bay Stations have failed to raise a triable issue of fact with respect to causation, and thus they cannot prevail.

The judgment of the district court is AFFIRMED.