# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 23-1218

DARRELL TAYLOR, et al.,

*Plaintiffs-Appellants*,

*v.*

THE SALVATION ARMY NATIONAL CORPORATION and
SALVATION ARMY d/b/a CENTRAL TERRITORIAL OF THE
SALVATION ARMY,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:21-cv-06105 — **John Robert Blakey**, *Judge*.

_____

ARGUED NOVEMBER 29, 2023 — DECIDED AUGUST 6, 2024

_____

Before RIPPLE, SCUDDER, and JACKSON-AKIWUMI, *Circuit Judges*.

RIPPLE, *Circuit Judge*. The Salvation Army operates residential rehabilitation centers for, in its words, "adults

struggling with life's spiritual and social challenges."[1] Some individuals enroll to deal with problems such as homelessness or substance abuse; others are referred to the centers by courts or parole or probation departments. Participants receive food, clothing, and housing for the duration of their stay and are required to work approximately forty hours per week for the Salvation Army. Although the Salvation Army characterizes that activity as "work therapy," the plaintiffs here—five former participants in the rehabilitation program—contend that the work is, in reality, forced labor. Those former participants brought this action, claiming that the Salvation Army subjected them to forced labor in violation of federal law. The Salvation Army moved to dismiss the plaintiffs' claims, and the district court granted that motion.

We affirm the judgment of the district court, although, on some issues, our analysis differs from that of the district court. At the outset, the *Rooker-Feldman* doctrine does not bar the claims brought by the plaintiffs who were on parole or probation at the time of their participation (the "justice-referred plaintiffs"), because those plaintiffs do not seek what in substance would be appellate review of any state-court judgments. Their claims fail on the merits, however, because they participated in the Salvation Army's program while subject to criminal sentences that seriously constrained their liberty—a fact with which they have not come to grips in this litigation. The other plaintiffs (the "walk-in plaintiffs") fare no better. Those plaintiffs were free to leave at any time, and the Salvation Army was entitled to condition its provision of

---

[1] Salvation Army Br. 1–2.

food, housing, and clothing to them on their continued satisfactory participation in the program. Finally, the district court correctly denied leave to amend. The plaintiffs' proposed second amended complaint, like their first amended complaint, did not contain plausible allegations indicating that the Salvation Army violated the forced labor provisions at issue in this case.

# I

## BACKGROUND

### A

Because this case comes to us on the dismissal of the complaint by the district court, we assume, for purposes of this appeal, that the well-pleaded factual allegations in that complaint are true. *See Martin v. Haling*, 94 F.4th 667, 671 (7th Cir. 2024). Those allegations form the basis of this rendition of the facts.

The Salvation Army is one of the largest charities in the world. It operates in the United States through a national organization, Salvation Army National Corporation ("Salvation Army National"), and four territorial organizations. One such territorial organization, which we will call Salvation Army Central Territory, runs the organization's operations in eleven states across the Midwest.[2]

As we noted in the introductory paragraph, the Salvation Army operates residential rehabilitation programs for individuals seeking spiritual, emotional, and social

---

[2] For ease of reading, we refer to these entities as "the Salvation Army" throughout this opinion.

assistance. Many participants enroll voluntarily in the rehabilitation programs because of problems such as homelessness and substance abuse. Other individuals are on parole or probation and are referred to the programs by courts or parole or probation departments. There is no charge for enrollment, and participants receive food, clothing, and housing from the Salvation Army for the duration of the program. Each participant must complete at least forty hours per week of what the Salvation Army terms "work therapy." This activity can include cooking, washing dishes, bussing tables, shoveling snow, loading and unloading donations from trucks, working in stockrooms and warehouses, or doing other work for the Salvation Army's thrift stores. Participants receive a small gratuity (between $1 and $25 per week) for the work, and they typically remain in the program for about six months.

The plaintiffs contend that the Salvation Army uses its rehabilitation programs not to rehabilitate people in need but instead as a "coercive labor arrangement that serves only the organization's financial interests."[3] Their complaint alleges that the Salvation Army targets marginalized individuals with "nowhere else to go" in order to obtain a workforce that is reliant on the Salvation Army.[4] According to the complaint, the Salvation Army cements this dependence in part through a "black-out period" spanning the first month to six weeks of the program. During that time, participants are prohibited from communicating with anyone outside the program. The Salvation Army also requires participants to assign

---

[3] Pls.' Reply Br. 1.

[4] First Am. Compl. ¶ 115.

temporarily any government benefits that they may be receiving, including Supplemental Nutrition Assistance Program ("SNAP") benefits,[5] to the Salvation Army. The work that the participants are required to do is physically demanding and sometimes dangerous. If participants do not work fast enough during their regular work shifts, they are required to work overtime.

Salvation Army staff often remind the participants that if they leave the program, they will lose the food and shelter that the Salvation Army provides. Such reminders tend to have a strong effect on the participants, especially those who entered while they were experiencing some combination of poverty, food insecurity, and homelessness. The stakes are even higher for participants on parole and probation. Before enrolling, some of those participants are told by their parole or probation officers that staying at the Salvation Army for at least some time is mandatory. While these participants are in the program, the parole and probation officers stay in "constant contact" with Salvation Army staff.[6] The staff tell the participants as much, threatening to reach out to the officers if they fail to complete their required labor in the time and manner dictated by the Salvation Army. Salvation Army staff even spell out the consequences that could follow from such reports, telling justice-referred participants that "if they [do] not follow the rules, including working, they [will] be kicked out of the program and [will] likely be incarcerated."[7]

---

[5] *See* 7 U.S.C. § 2013.

[6] First Am. Compl. ¶ 14.

[7] *Id*. ¶ 162.

**B**

Four former participants in the Salvation Army rehabilitation programs filed this action against Salvation Army National and Salvation Army Central Territory (collectively, "the Salvation Army"). The Salvation Army moved to dismiss their initial complaint on various grounds. Rather than respond to the motion to dismiss, these four former participants, along with one other former participant, filed an amended complaint. The five plaintiffs named in that amended complaint include three individuals who participated in the program while on parole or probation (the "justice-referred plaintiffs") and two who were not on parole or probation when they participated (the "walk-in plaintiffs"). The plaintiffs assert claims under 18 U.S.C. § 1589(a), which makes it unlawful to obtain labor by means of "serious harm," "threats of serious harm," or an "abuse or threatened abuse of law or legal process." They also assert claims under provisions that make it unlawful to knowingly benefit from participation in a venture that violates § 1589(a), *see* § 1589(b); to recruit a person for labor or services covered by § 1589(a), *see* § 1590(a); to attempt to violate § 1589(a), *see* § 1594(a); and to conspire to violate § 1589(a), *see* § 1594(b). The plaintiffs seek to represent classes of participants and former participants in Salvation Army rehabilitation programs located in the Salvation Army's Central Territory.

The Salvation Army filed a motion to dismiss the plaintiffs' first amended complaint, and the district court granted that motion. The district court first held that the plaintiffs had Article III standing. It reasoned that they had alleged an injury in fact (forced labor) fairly traceable to the Salvation Army's conduct (causing plaintiffs to work through

allegedly unlawful threats) that can be redressed by the court (through a damages award).

The district court then considered the applicability of the *Rooker-Feldman* doctrine to the claims brought by the justice-referred plaintiffs. The court noted the allegation that justice-referred participants are generally referred to the adult rehabilitation programs "by court order or as a condition of probation or parole."[8] The district court seemed to discern from that allegation that those plaintiffs participated "because a state court order compelled them to do so."[9] From there, the district court concluded that it could not redress their injuries "without overturning the state court's orders that required them to participate" in the rehabilitation programs.[10] The district court accordingly dismissed the justice-referred plaintiffs' claims on *Rooker-Feldman* grounds.

The district court then turned to the claims brought by the walk-in plaintiffs. It reasoned that the threats on which the walk-in plaintiffs relied were not sufficiently serious because there was "no allegation that Plaintiffs' access to food, clothing, and shelter could be withheld from them even after they had left the [rehabilitation] program."[11] Regarding the sub-standard working conditions alleged in the first amended complaint, the district court reasoned that a reasonable person in the walk-in plaintiffs' position would have felt free to leave and to try to obtain a better situation elsewhere.

---

[8] R.61 at 4 (citing First Am. Compl. ¶ 145).

[9] *Id.* at 5.

[10] *Id.* at 4.

[11] *Id.* at 9.

The district court further concluded that the walk-in plaintiffs' claims failed for the additional reason that their allegations did not plausibly indicate that either of the Salvation Army defendants acted with the requisite scienter. The district court thus dismissed the walk-in plaintiffs' claims for failure to state a claim. It then immediately entered judgment for the Salvation Army on all of the plaintiffs' claims.

The plaintiffs filed a Rule 59(e) motion to alter or amend the judgment and for leave to file a second amended complaint. They submitted that a proposed second amended complaint, which they attached to the motion, addressed any deficiencies in the first amended complaint, including the supposed *Rooker-Feldman* issue. In evaluating the plaintiffs' motion, the district court stated that the plaintiffs would only be entitled to amend their complaint if they could satisfy the requirement courts normally read into Rule 59(e): that the movant show a manifest mistake of law or fact or newly discovered evidence. The district court concluded that the plaintiffs had not satisfied that requirement. The district court added that the plaintiffs "had already amended their complaint … in response to a prior motion to dismiss."[12] It accordingly denied the plaintiffs' motion to alter or amend the judgment under Rule 59(e). This appeal followed.

---

[12] R.72 at 1.

## II

## DISCUSSION

## A

The Salvation Army contends that the plaintiffs do not have Article III standing. Echoing the district court, it also contends that the justice-referred plaintiffs' claims are barred by the *Rooker-Feldman* doctrine. We cannot accept these arguments. The plaintiffs have Article III standing, and *Rooker-Feldman* does not bar the justice-referred plaintiffs' claims.

### 1.

The Salvation Army submits that none of the plaintiffs have Article III standing. "The requisite elements of Article III standing are well established: A plaintiff must show (1) an injury in fact, (2) fairly traceably to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *Fed. Election Comm'n v. Ted Cruz for Senate*, 596 U.S. 289, 296 (2022).

The Salvation Army seems to recognize that the forced labor to which the plaintiffs allege they have been subjected constitutes an injury in fact. It also seems to recognize that this injury can be redressed by the damages the plaintiffs seek. *See Wernsing v. Thompson*, 423 F.3d 732, 745 (7th Cir. 2005) ("[I]njuries compensable in monetary damages can always be redressed by a court judgment."). The Salvation Army therefore focuses its standing argument on Article III's traceability requirement.

The traceability element of Article III standing "examines the causal connection between the assertedly unlawful

conduct and the alleged injury." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984). A plaintiff's burden on this element is "relatively modest at this stage of the litigation." *Bennett v. Spear*, 520 U.S. 154, 171 (1997). To satisfy that burden, the plaintiff need not establish that the defendant's conduct was the most immediate cause, or even a proximate cause, of the plaintiffs' injuries. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014). "An injury is not fairly traceable to a defendant's conduct if the causal chain is 'attenuated,' but Article III requires no more than a 'meaningful[] connect[ion]' between the two." *Pit Row, Inc. v. Costco Wholesale Corp.*, 101 F.4th 493, 502 (7th Cir. 2024) (quoting *Allen*, 468 U.S. at 757, then quoting *Dep't of Educ. v. Brown*, 600 U.S. 551, 568 (2023)).

The Salvation Army contends that the plaintiffs have not established traceability because they enrolled in the rehabilitation programs voluntarily and had the option to leave at any time. According to the Salvation Army, any injuries that the plaintiffs suffered were therefore "entirely self-inflicted" and cannot support standing.[13] This contention fails for multiple reasons. First, there is no "exception to traceability for injuries that a party purposely incurs." *Ted Cruz for Senate*, 596 U.S. at 296; *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374 (1982). Second, particularly at this procedural stage, when we are to take all of the plaintiffs' well-pleaded allegations as true,[14] we cannot agree that the

---

[13] Salvation Army Br. 31.

[14] *See Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691 (7th Cir. 2015) ("Under Rule 12(b)(1), 'the district court must accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom

injuries the plaintiffs allegedly suffered were "entirely self-inflicted." Instead, according to the amended complaint, it was the Salvation Army that cut the plaintiffs off from the outside world, overworked them in dangerous conditions, and obtained their labor through threats of incarceration and loss of food and shelter. The plaintiffs' allegations easily satisfy Article III's requirement of a "causal connection between the injury and the conduct complained of." *Brown*, 600 U.S. at 561 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Article III standing poses no bar to their claims.

**2.**

The Salvation Army also contends that the *Rooker-Feldman* doctrine bars the claims brought by the justice-referred plaintiffs. The district court agreed and dismissed their claims on that basis.

The *Rooker-Feldman* doctrine takes its name from the only two cases in which the Supreme Court has applied it: *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283 (2005). In both cases, the "losing party in state court filed suit in a U.S. District Court after the state proceedings ended, complaining of an injury caused by the state-court judgment and seeking federal-court review and rejection of that judgment." *Skinner v. Switzer*, 562 U.S. 521, 531 (2011). And in both cases, the Supreme Court held that the district court "lacked subject-matter jurisdiction over such claims, for 28 U.S.C. § 1257 'vests authority to review a state court's

in the plaintiff's favor, unless standing is challenged as a factual mater.'") (quoting *Reid L. v. Ill. State Bd. of Educ.*, 358 F.3d 511, 515 (7th Cir. 2004)).

judgment solely in [the Supreme Court].'" *Id.* at 531–32 (quoting *Exxon Mobil*, 544 U.S. at 292).

The *Rooker-Feldman* doctrine occupies "narrow ground." *Exxon Mobil*, 544 U.S. at 284. It is "confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* Notably, the doctrine "has no application to judicial review of executive action, including determinations made by a state administrative agency." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 644 n.3 (2002); *see Singletary v. District of Columbia*, 766 F.3d 66, 72 (D.C. Cir. 2014) (*Rooker-Feldman* did not bar "claim seek[ing] review of decision by the [D.C.] Board of Parole" because the Board is "'an executive entity,' not a court"). Further, the doctrine does not apply when "the plaintiff did not have a reasonable opportunity to raise the issue in state court proceedings." *Brokaw v. Weaver*, 305 F.3d 660, 668 (7th Cir. 2002) (quoting *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 559 (7th Cir. 1999)).

The district court held that *Rooker-Feldman* applied because "a state court order compelled" the justice-referred plaintiffs to participate and it could not redress their injuries "without overturning the state court's orders that required them to participate."[15] But the plaintiffs' allegations do not support the district court's assumption that a state court ordered the justice-referred plaintiffs to participate. Charles Lucas, for instance, participated while on parole, which in

---

[15] R.61 at 3, 4.

Illinois (where he served his sentence) is directed by an administrative agency, not by courts. *See* 730 ILCS 5/3-3-1(a)(5) (stating that the Prisoner Review Board is "the authority for setting conditions for parole and mandatory supervised release" in Illinois). And as the first amended complaint makes clear, it was Mr. Lucas's "parole officer [who] told him that staying at the [Salvation Army] was mandatory."[16] There is no indication in the complaint that a state court ordered him to stay there. Darrell Taylor, another justice-referred plaintiff, also participated while on parole in Illinois. He enrolled "to comply with aspects of his parole requirements"—specifically, the residency requirement.[17]

The situation with respect to Darrell Burkhart, the third justice-referred plaintiff, is not as clear from the first amended complaint, which merely states that Mr. Burkhart "was mandated to stay at the [Salvation Army] … as part of his probation."[18] The first amended complaint does not state *who* required him to stay there. Under the circumstances, the district court should have dealt with this ambiguity by inviting the plaintiffs to submit evidence or amend their complaint, rather than by dismissing their claims for lack of jurisdiction and immediately entering judgment. *See Helm v. Resolution Trust Corp.*, 84 F.3d 874, 879 (7th Cir. 1996) (stating

---

[16] First Am. Compl. ¶ 200.

[17] *Id.* ¶ 180.

[18] *Id.* ¶ 231. In Michigan, where Mr. Burkhart was sentenced, courts determine the conditions of probation, *see* Mich. Comp. Laws § 771.2a(5), and individuals on probation are placed "under the charge and supervision of a probation officer." *Id.* § 771.1(1); *see People v. Kumasi*, 795 N.W.2d 149, 149 (Mich. 2011) (discussing condition that probationer "maintain and/or seek employment as directed by" his probation officer).

that "leave to amend defective jurisdictional allegations should be freely given"); 28 U.S.C. § 1653 ("Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts.").[19] If the district court had given the plaintiffs an opportunity to clear up the confusion, it would have learned, as the plaintiffs state in their proposed second amended complaint, that it was Mr. Burkhart's "probation officer … [who] directed him to stay at the [Salvation Army] for three to six months as a condition of probation."[20] *See also* Proposed Second Am. Compl. ¶ 164 ("Burkhart's probation officer dropped him off at the Salvation Army and told him that he would violate his conditions of release, and risk reincarceration, if he left … before the end of the three- to six-month period.").

The district court seemed to draw its contrary conclusion from the plaintiffs' allegation that a "large proportion" of the Salvation Army's rehabilitation program participants are "referred … by court order or as a condition of probation or parole."[21] By itself, however, that allegation does not indicate that the three justice-referred plaintiffs named in the complaint (the only ones before the district court at this stage) were compelled to participate in this particular program by court order, and, as we have explained, the allegations pertaining to the named justice-referred plaintiffs refute that

---

[19] Notably, the Salvation Army's argument in the district court related to the *Rooker-Feldman* doctrine was confined to a short footnote in the briefs it submitted in support of its motion to dismiss and renewed motion to dismiss.

[20] Proposed Second Am. Compl. ¶ 163.

[21] First Am. Compl. ¶ 145.

inference. Therefore, based on the record before the district court and us, none of the named justice-referred plaintiffs enrolled because they were ordered to do so by a state court.

That clarification eliminates any *Rooker-Feldman* problem that might have existed for the justice-referred plaintiffs. Those plaintiffs are "state-court losers," and the relevant state-court judgments (their criminal sentences) were "rendered before the district court proceedings commenced." *Exxon Mobil*, 544 U.S. at 284. But their criminal sentences are the "cause[]" of their alleged injuries only in the most tenuous way. *Id.* The court orders imposing their criminal sentences, and even perhaps allowing for parole or probation, did not impose any specific work requirements or work conditions. Further, the plaintiffs do not "invit[e] district court review and rejection of" their sentences, *id.*, and they are not "seeking what in substance would be appellate review" of their sentences. *Johnson v. De Grandy*, 512 U.S. 997, 1005 (1994). The plaintiffs here do not object to the fact of their criminal sentences but to the conditions in which they must serve them. Their case is therefore much more akin to a "conditions of confinement" case brought independently of a criminal proceeding. *See Copeland v. C.A.A.I.R.*, No. 21-5024, 2023 WL 3166345, at *14-15 (10th Cir. May 1, 2023) (holding that *Rooker-Feldman* did not bar forced labor claims brought by individuals who were ordered to participate in drug and alcohol rehabilitation program in lieu of incarceration).

**B**

**1.**

We begin our consideration of the merits by setting forth the basic principles that must guide our determination as to

whether the complaint adequately states a claim upon which relief can be granted.

A claim for relief must be plausible; it cannot be merely conceivable or speculative. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 556 (2007). This principle does not, and under the strictures of Rule 8 cannot, present a high barrier to the pleader. Rather, it sets forth a practical requirement specifically attuned to the early stage of litigation that it governs. Its requirement is straightforward: The plaintiff must "present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). The complaint must include sufficient details to make the plaintiffs' account one that *could* have happened and, if it did happen, states a claim cognizable under the governing law. *Runnion v. Girl Scouts of Greater Chi.*, 786 F.3d 510, 526 (7th Cir. 2015); *see also Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014). As the Supreme Court put it in *Twombly*, the complaint must show "enough heft" to demonstrate that, if the allegations prove to be true, the pleader is entitled to relief. 550 U.S. at 557.[22]

When assessing whether a complaint has sufficient "heft," practical considerations must predominate. As the Supreme Court put it in *Iqbal*, assessing the sufficiency of a complaint is "a context-specific task" that requires a court "to draw on

---

[22] We therefore cannot accept the dissent's allegation that we are adopting a new, and more stringent, standard than the one set forth in Rule 8. We simply stress, as has the Supreme Court, that the underlying policy concern of Rule 8 must always be a guiding beacon when we assess the adequacy of the complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 662, 678 (2009).

its judicial experience and common sense." 556 U.S. at 679. It also requires that we understand the statutory text on which the claims of the complaint are predicated. If the cause of action relies on a broad-gauged statute, more factual particularity may be required in the complaint to give adequate notice of the gravamen of the plaintiffs' grievance.[23] Similarly, if the underlying facts of the case present a situation not within the heartland of those circumstances usually encountered in litigation under the statute, a more precise factual rendition may be necessary. Of course, the vantage point of the plaintiff is also an important factor. Our expectations at the pleading stage must be commensurate with the information available at this pre-discovery stage. *See Bausch v. Stryker Co.*, 630 F.3d 546, 561 (7th Cir. 2015).[24]

---

[23] Of course, the plaintiff does not have to set forth a legal theory of the case, *Skinner*, 562 U.S. at 530, or a specific statute upon which the claim is based, *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam). All that is required are factual allegations "that give the defendant fair notice of the claim for relief and show the claim has 'substantive plausibility.'" *Runnion*, 786 F.3d at 517 (quoting *City of Shelby*, 574 U.S. at 12).

[24] The dissent takes issue with our use of the term "broad-gauged statute." It appears to suggest that even if we are not introducing a new pleading standard as a matter of law, we are adopting one as a practical matter. We cannot accept this criticism. Again, we simply point out one of the oft-recognized situations where significant sensitivity to the notice requirement of Rule 8 is necessary. This term must be read in the context of the entire discussion of pleading standards contained in this opinion and not *in vacuo*. Read in that way, the phrase simply describes, in descriptive short-hand, statutes that can apply in a wide range of situations and therefore require particular attention to the notice requirement. *See Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010) ("A more complex case involving financial derivatives, or tax fraud that the parties tried hard to conceal, or antitrust violations, will require more

Remembering that our task is a context-specific one and that the considerations that we have just mentioned will vary in importance from case to case, we now turn to the complaint before us. The plaintiffs' claims are predicated on 18 U.S.C. § 1589.[25] This section, titled "Forced Labor," forbids anyone from "knowingly … provid[ing] or obtain[ing] the labor or services of any person":

1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

2) by means of serious harm or threats of serious harm to that person or another person;

3) by means of the abuse or threatened abuse of law or legal process; or

---

detail, both to give the opposing party notice of what the case is all about and to show how, in the plaintiff's mind at least, the dots should be connected."); *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2003) ("RICO cases, like antitrust cases, are 'big' cases and the defendant should not be put to the expense of big-case discovery on the basis of a thread-bare claim.").

In a similar vein, the dissent criticizes the statement that if "the underlying facts of the case present a situation not within the heartland of the circumstances usually encountered in litigation under the statute, a more precise factual rendition may be necessary." Again, we are simply emphasizing the need for adequate notice in circumstances that are "complicated and counterintuitive." *McCauley v. City of Chicago*, 671 F.3d 611, 619 (7th Cir. 2011). For the same reason, the dissent's criticism of the term "heartland" is without substance when read in context.

[25] *See* First Am. Compl. ¶¶ 276–316 (asserting claims under 18 U.S.C. §§ 1589(a), 1589(b), 1590(a), 1594(a), 1594(b)).

4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

§ 1589(a).[26] "Serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." § 1589(c)(2).

Section 1589 was enacted as part of the Trafficking Victims Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464. This section was intended "to address issues raised by the decision of the Supreme Court in *United States v. Kozminski*, 487 U.S. 931 (1988)." H.R. Rep. No. 106-939, at 100 (2000) (Conf. Rep.); *see* 22 U.S.C. § 7101(b)(13) (legislative findings). In *Kozminski*, the Supreme Court had held that, although conduct involving legal coercion[27] or physical coercion could violate the earlier

---

[26] This section may be enforced through civil or criminal penalties. *See* 18 U.S.C. §§ 1589(d), 1595(a). The case before us is a civil matter.

[27] *See, e.g.*, *United States v. Reynolds*, 235 U.S. 133, 139–40 (1914) (defendants paid court fines for persons convicted in state court, had those persons work to pay off the debt, and, when they refused to continue to work, had them convicted under a state statute making it a crime for a convict "working out" a fine paid by a surety to refuse to continue to work); *Bernal v. United States*, 241 F. 339, 341 (5th Cir. 1917) (defendant threatened that, if housemaid left his home without repaying a debt, he would call the immigration authorities, who would put her in jail for five years); *United States v. Ingalls*, 73 F. Supp. 76, 77 (S.D. Cal. 1947) (defendant threatened

statutory prohibition on involuntary servitude, other forms of coercion[28] were not within the statutory ambit. 487 U.S. at 952. Congress disagreed with the way the Court "narrowly interpreted" the involuntary servitude statute, 22 U.S.C. § 7101(b)(13) (legislative findings), and so it added Section 1589 to "combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in *Kozminski*." H.R. Rep. 106-939, at 101. Given the clear congressional mandate that the statute must be read to proscribe variations of human exploitation not recognized as such by pre-existing law, we must be careful in the present case not to give the statute a crabbed reading that will undermine Congress's work. Nor can we be too quick to assume the legal legitimacy of work relationships which, while tolerated in days past, exact a significant and unacceptable burden, albeit not a physical one, that Congress intended, through the present statutory language, to prohibit.

**2.**

We now turn to the operative complaint. It recites the stories of two groups of individuals: (1) the so-called walk-in individuals who voluntarily sought participation in the

---

that, if houseworker left the defendant's estate, the defendant would tell the police about an abortion that the houseworker had obtained).

[28] The coercive techniques used in *Kozminski* included "disorienting the victims with frequent verbal abuse … ; inducing poor health by denying medical care and subjecting the victims to substandard food, clothing, and living conditions; working the victims from 3 a.m. to 8:30 p.m. with no days off, leaving them tired and without free time to seek alternative work; denying the victims any payment for their labor; and [isolating] the victims from contact with outsiders who might help them." 487 U.S. at 956 (Brennan, J., concurring).

Salvation Army's program because of problems such as homelessness or an addiction to alcohol or illicit drugs; and (2) those individuals who participate in the program as a required component of a judicially imposed court supervision program, such as probation, parole, or other form of supervised release. With respect to each group, the complaint must plead adequately that the Salvation Army: obtained their labor or services;[29] by the unlawful coercive means forbidden by the statute; and that the Salvation Army did so knowingly.

We turn first to the walk-in plaintiffs. These participants voluntarily joined the program. The gravamen of the complaint is that the Salvation Army secured their *continued* participation in the program by threating a harm "sufficiently serious … to compel a reasonable person of the same background and in the same circumstances … to continue to perform labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

The principal "serious harm" alleged in the complaint is the Salvation Army's discontinuation of food, clothing, and shelter allowances. But, under the terms of the plan, these allowances are provided only during participation in the Salvation Army's program. They are simply components of participation in the program. The Salvation Army is entitled to stop providing food, clothing, and shelter to someone who no longer wishes to participate. It may also remind the participants that leaving the program results in the cessation

---

[29] We pretermit any discussion of whether work done as part of participation in the Salvation Army's rehabilitation program constitutes "labor or services" within the meaning of the statute.

of the benefits of the program. "The former is a legitimate consequence, the latter a legitimate warning." *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012) (citing *United States v. Bradley*, 390 F.3d 145, 151 (1st Cir. 2004)). "Neither supports a forced labor claim." *Id.*

The plaintiffs also submit that the six-week long "blackout period" in which external communications are restricted and the ban on obtaining outside employment magnified the difficulties of leaving the program. Such restrictions, however, are fairly standard in rehabilitation programs. *See* Scott Collier & Mardell Gavriel, *Mobile Phones in Residential Treatment: Implications for Practice*, 55 J. Substance Abuse Treatment 45, 45 (2015) ("Most [residential substance abuse programs] do not allow clients to bring mobile devices at all and restrict Internet and email access as well."). And as the district court emphasized, the plaintiffs could have regained both the ability to do other work, as well as the ability to access their cell phones and the internet, by leaving the program early, which they were always free to do. We agree with the district court that the walk-in plaintiffs in no way present a plausible basis for concluding that a reasonable person would not have felt free to leave the program.

Notably, the statute also has a scienter requirement: the defendant (here the Salvation Army) must intend that the worker believe that serious harm would befall one who refused to work. *See United States v. Calimlim*, 538 F.3d 706, 711 (7th Cir. 2008). As the district court stressed, given the voluntary nature of participation in the program, it is difficult to see how the Salvation Army could have harbored such an intent. The complaint contains no allegations that plausibly indicate that the Salvation Army had such an intent.

The plaintiffs, and the dissent, nevertheless submit that the account set forth in the complaint tells a plausible story that the Salvation Army sustained its operation by preying on the most vulnerable in our society; it entrapped them in a coercive environment from which, as a practical matter, there was no realistic escape. There is an "obvious alternative explanation," however, for the Salvation Army's decision to seek out individuals dealing with homelessness, substance abuse, and issues with the criminal justice system. *Twombly*, 550 U.S. at 567. Those are the individuals most likely to choose to participate in, and to ultimately benefit from, the residential rehabilitation program. The allegations describe a responsibly run treatment program designed to assist individuals who, in order to rid themselves of an alcohol or drug dependency, need to subject themselves to a safe and disciplined environment free of the distractions that can induce so easily retrogressive behavior. The allegations relating to the walk-in plaintiffs therefore do not plausibly indicate that the Salvation Army violated the forced labor provisions at issue in this case, and the district court correctly concluded that they failed to state a claim.

The second category of participants, referred to as the "justice-referred" participants throughout this litigation, presents a different set of analytical problems for the parties and for us.[30] These individuals were not voluntary participants in the Salvation Army's program. They participated while serving criminal sentences, which deprived them of the "absolute liberty to which every citizen

---

[30] Because the district court dismissed the claims of these parties on the ground that they were barred by the *Rooker-Feldman* doctrine, the court did not address the adequacy of the complaint under Rule 8.

is entitled." *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)).

As individuals subject to a criminal sentence, and therefore to the government's legitimate authority to effectuate the objectives of criminal justice, these participants cannot expect to have the same freedom of choice with respect to their work and living conditions as individuals not subject to the legitimate penal objectives of the state. This restriction does not mean, of course, that these individuals have no protection against excesses in the behavior of their governmental custodians or of the private actors such as the Salvation Army to whom the government may delegate some responsibility. The constitutions and laws of the federal government and of the several states protect the participants from such abusive behavior; the reports of every court in the United States are filled with cases that demonstrate that this restraint on unbridled government authority is a reality, although at times an imperfect one. Assuming that Section 1589 even applies to the execution of a lawfully imposed sentence (a question not presented by the parties), at a minimum, that section certainly must be applied in a manner that acknowledges that the liberty interests that it protects have been curtailed sharply in the case of those subject to the legitimate restraints of a criminal judgment. Because of this unique characteristic of justice-referred participants in the program, such a participant has a responsibility to delineate, with some clarity and precision, the nature of the alleged violation. More precisely, such a plaintiff needs to demonstrate how the conduct alleged in the complaint is incompatible with the legitimate constraints of the particular penal judgment imposed on the plaintiff. Without such information, a private entity participating in the

government's effort at rehabilitation can hardly be expected to defend itself.

The complaint before us does not meet that obligation. It does not come to grips with the fact that the justice-referred participants are in a very different situation from other participants who have not had their liberty restricted by a penal judgment. As such, this complaint is hardly a suitable vehicle for full and fair litigation of this issue.

**3.**

We turn now to the plaintiffs' submission that the district court should have allowed them to amend the complaint a second time. As noted earlier, the district court denied the plaintiffs' Rule 59(e) motion and accompanying request for leave to amend because the plaintiffs had not satisfied the requirement that courts typically read into Rule 59(e)—that the movant demonstrate a manifest error of law or fact or newly discovered evidence.[31] It did not address the question of whether leave to amend was warranted under the less demanding Rule 15(a)(2) standard.

As an initial matter, the district court erred in evaluating the request to amend under the standard courts normally read into Rule 59(e), rather than under the standard of Rule 15(a)(2). Rule 15(a)(2) provides the standard for evaluating "post-judgment motions for leave to amend … in situations, like this one, where a district court enters judgment at the same time it first dismisses a case." *KAP Holdings, LLC v. Mar-*

---

[31] Rule 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after entry of judgment." It "does not specify the available grounds for obtaining such relief." *Rollins v. Home Depot USA, Inc.*, 8 F.4th 393, 396 (5th Cir. 2021).

*Cone Appliance Parts Co.*, 55 F.4th 517, 528 (7th Cir. 2022) (quoting *NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 310 (7th Cir. 2018)). The reason is that "[a] district court cannot nullify the liberal right to amend under Rule 15(a)(2) by entering judgment prematurely at the same time it dismisses a complaint that would be amended." *Gonzalez-Koeneke v. West*, 791 F.3d 801, 808 (7th Cir. 2015) (quoting *Runnion*, 786 F.3d at 522).[32] The district court concluded that this approach only applied if the plaintiffs had not had a previous opportunity to amend. But that is not correct: our case law provides that, even in such cases, Rule 15(a)(2) provides the right framework. *See O'Brien v. Vill. of Lincolnshire*, 955 F.3d 616, 629 (7th Cir. 2020) (holding that district court should have evaluated post-judgment request for leave to file fourth amended complaint under Rule 15(a)(2)).

Although the district court relied on an erroneous standard, it reached the correct result. A district court "may deny leave to amend a complaint if the amendment would be futile," *Glover v. Carr*, 949 F.3d 364, 367–68 (7th Cir. 2020), and our review of the tendered amended complaint makes it clear that it would not have cured the deficiencies that we have identified in the complaint before us.

The primary set of new allegations to which the plaintiffs invite our attention pertains to SNAP benefits. In the first amended complaint, the plaintiffs stated that, as part of the intake process, the Salvation Army encouraged them to sign

---

[32] *See also Foman v. Davis*, 371 U.S. 178, 182 (1962) (relying on Rule 15(a) in reversing district court's denial of a plaintiff's post-judgment request to amend, which accompanied a motion construed as a Rule 59(e) motion).

up for SNAP benefits and required them to sign over their SNAP benefits to the Salvation Army. In the proposed second amended complaint, the plaintiffs supplement that allegation by stating that, when several of them left the program earlier than expected, the Salvation Army did not immediately return their SNAP benefits cards. In addition, according to the new complaint, one of the plaintiffs was able to get his benefits card back, but it allegedly had $0 left on it for the month, even though it was not the end of the month. We recognize the obvious importance of the SNAP benefits program to those individuals. But we cannot plausibly infer solely from these allegations that the Salvation Army used its control over the SNAP benefits cards to obtain or attempt to obtain forced labor, as the plaintiffs submit.

The plaintiffs also invite our attention to new allegations pertaining specifically to the walk-in plaintiffs. According to the proposed second amended complaint, the walk-in plaintiffs regularly had to work well over forty hours per week, and some work they had to do was so strenuous as to cause them physical pain. In addition, Salvation Army staff allegedly yelled at Kevin Lewis, one of the walk-in plaintiffs, when he did not meet demanding productivity quotas. These allegations still fall short because they do not indicate that the Salvation Army in any way attempted to prevent the plaintiffs from leaving the program. If the plaintiffs believed they were being overworked or did not like their working conditions, they could have left at any time. *See Muchira v. Al-Rawaf*, 850 F.3d 605, 620 (4th Cir. 2017); *United States v. Calimlim*, 538 F. 3d 706, 712 (7th Cir. 2008).

Finally, the plaintiffs invite our attention to new allegations regarding the justice-referred plaintiffs, but those

new allegations also fail to provide an adequate foundation for litigation under this statute. Mr. Taylor now alleges that he was sometimes required to work seven days a week, for a total of fifty-six hours per week, and that he was often hungry, because the bagged lunch the Salvation Army gave him did not have enough food in it. Mr. Lucas had to lift heavy objects in a basement with rats; when he complained, Salvation Army staff told him that if he did not stop complaining, he would be kicked out of the program and immediately reincarcerated. As for Mr. Burkhart, Salvation Army staff directed him to work from 9:30 A.M. to 9:30 P.M. from Monday to Saturday, every week. Therefore, he was forced to work through the dinner that was provided to others at the facility, and he did not have any dinner six out of seven days a week.

Although these allegations paint a more detailed description of the conditions under which these justice-referred plaintiffs worked and lived, this statute is not simply a vehicle for the regulation of living and working conditions of individuals serving a sentence of parole or probation. Its aim is to prohibit forced labor under the threat of legal consequences, and these allegations give the defendants no better idea of what they must defend against than the complaint before us. Again, assuming that the statute is at all applicable to parole and probation arrangements, the defendants need a more specific description of how, in the context of probationers and parolees, the actions of the Salvation Army induced the forced labor proscribed by the statute.

## Conclusion

The first amended complaint fails to allege adequately a claim under any of the forced labor provisions at issue in this

case. The tendered second amended complaint would not have cured the deficiencies of its predecessors. The judgment of the district court is affirmed.

AFFIRMED

JACKSON-AKIWUMI, *Circuit Judge,* concurring in part and dissenting in part. I agree with my colleagues that Plaintiffs have standing, and that *Rooker-Feldman* does not bar the justice-referred Plaintiffs' claims. I also agree that the district court erred in evaluating Plaintiffs' motion to amend under Rule 59(e) as opposed to Rule 15(a)(2). Despite these areas of agreement, I must dissent because I cannot join what I view as the majority opinion's misreading of Plaintiffs' First Amended Class Action Complaint. This case comes to us from the district court's dismissal of that complaint, so our review is limited to whether Plaintiffs have alleged enough to survive a motion to dismiss. Because I believe they have, I would reverse the judgment of the district court and allow this case to proceed to discovery.

**I**

Federal Rule of Civil Procedure 8 provides the standard for this case. Under that rule, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rule 8's purpose, the Supreme Court has explained, is "to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (cleaned). A plaintiff therefore is not required to provide "detailed factual allegations" to comply with the rule, *see id.*; all a plaintiff must do is plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). If a complaint does that, it may proceed "even if it strikes a savvy judge that actual proof of . . . facts [supporting relief] is improbable, and 'that a recovery is very remote

and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

Our cases have made the point more succinctly. At the motion to dismiss stage, we have said, "the factual allegations in the complaint need not prove the claim." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 551 (7th Cir. 2023). "They need to show only that the claim is 'plausible on its face' and that [assuming] the allegations are true, the plaintiff is entitled to relief." *Id.* (quoting *Roldan v. Stroud*, 52 F.4th 335, 339 (7th Cir. 2022)). This standard is "not demanding," *id.*, and Plaintiffs' allegations easily meet it.

Plaintiffs are former participants in the Salvation Army's Adult Rehabilitation Centers (ARCs). Some of them found their own way to the ARCs, but others were "justice-referred," meaning that participating in the program was "a requirement of their probation, or the stable housing the ARC provides [was] a necessity of their parole." Plaintiffs, "walk-ins" and "justice-referred" alike, allege that the Salvation Army forced them to labor through "sustained and targeted psychological coercion and threats of serious harm."

As Plaintiffs tell it, the coercive forced labor scheme began before they ever got to an ARC. They allege that the Salvation Army "target[s]" people who have substance abuse issues or are unhoused, food-insecure, experiencing poverty, or involved in the justice system. Once these people are recruited to an ARC, they are expected to "perform strenuous, often dangerous labor, including in its warehouses, kitchens, stores, and on its donation collection trucks," for "at least 8 hours per day, and at least 40 hours per week," for as little as "$0.02 and $0.62 per hour." If participants do not perform these tasks (or do not perform them to the Salvation Army's

satisfaction), the Salvation Army "threaten[s] [them] with loss of access to food and shelter."

These threats were real for the walk-in Plaintiffs, the complaint alleges, because the provisions supplied by the Salvation Army were all they had after joining an ARC. That is because the Salvation Army requires that "members of the ARC workforce assign their rights and/or sign over their governmental support benefits and/or vouchers, including Supplemental Nutritional Assistance Program (SNAP) and social security disability benefits, to The Salvation Army and forfeit any discretion over how they are spent." The Salvation Army also requires participants to "forfeit their personal items including clothing, jewelry, cell phones, electronics, and many prescribed medications." Because of these conditions, walk-in Plaintiffs became "fully reliant on the ARC program for food, clothing, and housing," which "directly impede[d] [their] ability to flee The Salvation Army's ARC facilities."

The complaint explains, too, that the threats of loss of food and shelter were not idle for the walk-in Plaintiffs. "Workers in the ARC program were abruptly kicked out of the program for not following the rules, often with no other place to live." For plaintiff Kevin Lewis, that vulnerability "cultivated" a "reliance on the ARC for necessities, including food and shelter."

The threat for justice-referred ARC participants was different but no less real, according to the complaint. "In addition to the conditions faced by the walk-in workforce, justice-referred workers face[d] the threat of incarceration for not complying with SA Central Territory's forced labor program." For justice-referred Plaintiffs, the threats included "submitting negative probation reports, calling a worker's

probation or parole officer directly to report 'misbehavior,' calling the police on a worker, and simply kicking the worker out of the ARC, causing the worker to violate the terms of their probation or parole." Plaintiffs allege that the Salvation Army also used these threats "to obtain or coerce labor from members of the walk-in ARC workforce who are on parole or probation." Whenever Plaintiffs "d[id] not perform required work, work[ed] too slowly, or work[ed] below [the Salvation Army's] standards," they were threatened. "Both parole or probation officers and [Salvation Army] employees reiterated to [justice-referred Plaintiffs] that if they did not follow the rules, including working, they would be kicked out of the program and would likely be incarcerated."

These are just a few of the details Plaintiffs allege in their 46-page complaint, but these details sufficiently demonstrate that the complaint has "heft," so I depart from the majority opinion's contrary conclusion. *Ante*, at 16.

At the end of the day, we do not have to view Defendant's actions the same way Plaintiffs do or believe in Plaintiffs' likelihood of success, but that does not mean they have failed to "present a story that holds together." *Ante*, at 16 (citing *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)). From Plaintiffs' complaint, we know exactly what their theory of this case is and the facts they think prove that theory. That is all that is required at this early stage in the litigation.

## II

The majority opinion reaches the opposite conclusion by (a) raising the pleading standard for Trafficking Victim Protection Reauthorization Act (TVPRA) claims, (b) misapprehending the totality of the harm Plaintiffs alleged, and (c)

holding that the Plaintiffs did not plead scienter and the lack of an exit option. I find each of these moves problematic.

**A**

To begin, the majority opinion attempts to impose a heightened pleading standard for TVPRA claims. Under the majority opinion's new standard, if a plaintiff's cause of action "relies on a broad-gauged statute, more factual particularity may be required . . . to give adequate notice of the gravamen of the plaintiffs' grievance." *Ante*, at 17. And if "the underlying facts of the case present a situation not within the heartland of those circumstances usually encountered in litigation under the statute, a more precise factual rendition may be necessary." *Id*. Both of these are novel pleading requirements.

It will not be lost on the reader that the majority opinion never cites any authority for requiring something greater than the normal Rule 8 pleading standard in these cases. But that is not the only issue I see.

The majority opinion's new standard is unhelpful because it never explains how plaintiffs (and district courts) should decide if a plaintiff's claims fit "within the heartland" of a statute. Indeed, a "heartland" analysis would be a particularly awkward requirement for a statute like the TVPRA because Congress designed the statute to reach a wide array of activity beyond trafficking. Both the text of the statute and the legislative history confirm this.

By its terms, the statute broadly prohibits "obtain[ing] the labor or services of a person" by means of force, serious harm, threats of harm, or abuse of legal process, among other things. 18 U.S.C. § 1589(a). The legislative history makes clear

Congress broadened the statute to reach other forms of "worker exploitation that do not rise to the level of involuntary servitude." H.R. REP. No. 106–939, at 101 (2000) (Conf. Rep.). To aid in pursuit of that goal, Congress also broadened the statutory meaning of "trafficking." Under the new language, trafficking includes "violations of other laws, including labor and immigration codes and laws against kidnapping, slavery, false imprisonment, assault, battery, pandering, fraud, and extortion." *Id.* at 4.

The majority opinion's new pleading standard strikes me as unwise for another reason. As it is currently written, the standard would establish one pleading threshold for, say, a sex trafficking claim, which would likely constitute the "heartland" of the statute, and another for a forced labor claim. That is so even though both claims would arise under the same section of the same statute and even though nothing in the statute or its history suggests that Congress meant for those claims to be treated differently. In fact, the text and history of the statute prove the opposite: Congress wanted to expand the conduct covered by the statute and make it easier to bring other types of claims. *See* H.R. REP. No. 108-264, pt. 1, at 8 (2003). Requiring a "heartland" analysis would put the statute at war with that goal by making it harder to bring the types of claims that Congress's expansion was designed to reach.

But even if the majority opinion were correct that a heightened standard should apply, I would still dissent from its analysis because the "factual particularity" in Plaintiffs' allegations easily satisfies the majority's new standard. As explained above, the complaint contains detailed factual allegations about how the Salvation Army's ARCs are designed to

"purposefully target and recruit marginalized individuals," induce them to "rel[y] on the ARC program for food, clothing, and housing," and then threaten to kick them out (without food, clothing, or housing) if they do not work as often or as hard as Salvation Army employees want them to. Those detailed allegations are more than sufficient to put Defendants on notice of the precise nature of Plaintiffs' claims, even if those claims may not fall "within the heartland" of the TVPRA.

**B**

The majority opinion's introduction of a new pleading standard is not the only shortcoming I see. The opinion also overlooks the psychological harms Plaintiffs alleged. The opinion frames Plaintiffs' "principal" harm as "the Salvation Army's discontinuation of food, clothing, and shelter allowances" and the "six-week long 'blackout period'" to which ARC participants are subjected. *Ante*, at 21–22. And those components, the opinion decides, do not qualify as "harm" for TVPRA purposes; they are "simply components of participation in the program." *Id*. The opinion nowhere acknowledges the psychological element of the Plaintiffs' alleged harms. By failing to do so, the majority opinion reads those allegations out of Plaintiffs' complaint altogether.

Plaintiffs were clear in both their complaint and at oral argument that the harm they allege is, in no small part, psychological. The complaint alleges that the Salvation Army engaged in "sustained and targeted psychological coercion" to extract Plaintiffs' labor. The complaint describes how the Salvation Army caused previously food-insecure, unhoused, and impoverished Plaintiffs to rely on the organization for food, clothing, and shelter. The Salvation Army allegedly

induced that reliance by taking whatever possessions and benefits Plaintiffs had before they entered the program. Then, once Plaintiffs became dependent on the Salvation Army to meet their basic needs, the organization would deploy the threat of withdrawing those provisions to keep Plaintiffs engaged in labor they did not want to perform.

To the extent there is any debate about whether this kind of harm constitutes psychological harm under the TVPRA, that is a fact question for a factfinder. The question before us is limited to whether these allegations pass muster at this motion to dismiss stage. Given the statutory language, I think they easily do. The TVPRA defines "serious harm" as any harm, "whether physical or nonphysical, *including* psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2) (emphasis added).

That definition obligates us to consider Plaintiffs' "background" and "circumstances." *Id*. But the analysis in the majority opinion lacks any consideration of Plaintiffs' circumstances. Rather, the opinion proclaims that Plaintiffs "could have left at any time" if they "did not like their working conditions." *Ante* at 26. This conclusion is contrary to the allegations in Plaintiffs' complaint, which describes a situation where psychological coercion prevented Plaintiffs from leaving. By substituting some other reality for that described by Plaintiffs, the majority opinion not only reads the alleged psychological harm out of Plaintiffs' complaint; it also reads out

of the statute Congress's command to consider Plaintiffs' background and circumstances.

## C

I see two additional issues with the majority opinion's reading of Plaintiffs' complaint; both relate to what the opinion says Plaintiffs needed to plead but did not. First, the opinion holds that Plaintiffs' allegations do not meet the TVPRA's scienter requirement. *Ante*, at 22. Second, the opinion holds that Plaintiffs were required to plead that the Salvation Army attempted to prevent them from leaving the program. *Ante*, at 27. I disagree on both counts.

First, scienter. The majority opinion is correct that § 1589 contains a scienter requirement: a plaintiff must prove that the defendant intended to cause the victim to believe that serious harm would result if they did not engage in forced labor. *Ante*, at 22 (citing *United States v. Calimlim*, 538 F.3d 706, 711 (7th Cir. 2008)). Plaintiffs' complaint meets this requirement. Again, the allegations are that the Salvation Army sought out vulnerable workers, required those workers to turn over their possessions and benefits, and used the threat of ejecting the workers from the program to force their labor. Plaintiffs further allege that some workers were kicked out and had to live on the street, which reinforced the threat. Taking these allegations as true, it is easy to see how the Salvation Army intentionally manufactured and sustained a coercive environment that kept Plaintiffs engaged in work they did not want to do. Thus, I would find that Plaintiffs adequately pled scienter.

Second, the majority opinion says Plaintiffs cannot state a claim under § 1589 because they did not plead that the Salvation Army attempted to prevent them from leaving. *Ante*, at

27. But that is not a requirement of the statute. As the Third Circuit recently recognized, the TVPRA "encompasses circumstances in which the person whose labor is being exploited is faced with any number of choices as an alternative to working, including actual or threatened physical restraint, serious harm, and abuse of law or legal process." *Burrell v. Staff*, 60 F.4th 25, 37 (3d Cir.), *cert. denied sub nom. Lackawanna Recycling Ctr., Inc. v. Burrell*, 143 S. Ct. 2662, (2023) (citing 18 U.S.C. § 1589(a)). Under § 1589(a), "a victim can face more than a binary choice and remain protected by the statute." *Id*. After all, in expanding the TVPRA, Congress sought to include "more-expansive definitions of coercion [that] reflect the 'increasingly subtle' ways by which labor may be forced." *Id*. (citing *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011)).

The majority opinion locates its restraint requirement in *Muchira v. Al-Rawaf*, 850 F.3d 605, 620 (4th Cir. 2017), and *United States v. Calimlim*, 538 F. 3d 706, 712 (7th Cir. 2008), but both are inapposite.

The first thing to note about these two cases is that they were decided further along in the litigation than the case we have before us. *Calimlim*, a criminal case, avoided dismissal and proceeded to a jury trial on the § 1589 charge. *Muchira*, a civil case like this one, was decided at summary judgment. That means, unlike here, the court allowed Muchira's claims to proceed beyond the motion to dismiss stage and gave her the opportunity to develop the factual record. It was only when Muchira could not prove her claim after discovery that the court held that she did not "present sufficient evidence upon which a jury could reasonably conclude that the Saudi family knowingly or intentionally engaged in actions or

made threats that were sufficiently serious to compel a reasonable person in Muchira's position to remain in the Saudi family's employ." *Muchira*, 850 F.3d at 620 (emphasis omitted).

We should also not overlook the scope of *Muchira*'s holding. In analyzing Muchira's § 1589 claim, the Fourth Circuit suggested that Muchira could have prevailed in one of three ways: she could have shown that her employer (1) "knowingly forced [her] to provide her labor or services by means of serious harm or threats of serious harm, [(2)] that she continued to labor in order to avoid physical or psychological harm, *or* [(3)] that the conditions of her employment were such that she reasonably believed that she had no viable exit option." *Id.* (emphasis added). By focusing on the third route, the majority opinion ignores the other permissible means the Fourth Circuit identified. And, here, Plaintiffs' claims would satisfy either.

In requiring § 1589 plaintiffs to prove that they were effectively restrained from leaving, the majority opinion reads the statute far more narrowly than our sister circuits have. But even under that strained reading, Plaintiffs in this case should move forward because, as I explained earlier, they did allege that the Salvation Army prevented them from leaving.

*     *     *

In sum, I disagree with the majority opinion's unsupported and unjustified raising of the pleading standard for TVPRA claims and its narrowing of the statutory cause of action. I respectfully dissent.